# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD ROYCROFT, individually and on behalf of all those similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>METLIFE, INC., METROPOLITAN LIFE INSURANCE COMPANY and BRIGHTHOUSE FINANCIAL,<br><br>     Defendants. | C.A. No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Edward Roycroft ("Plaintiff"), individually and on behalf of all those similarly situated, files this Class Action Complaint against MetLife, Inc., Metropolitan Life Insurance Company, and Brighthouse Financial, Inc. (collectively, "MetLife" or the "Company") for conversion and unjust enrichment relating to the Company's taking of retirement annuity benefits from retirees. Plaintiff also seeks an accounting from MetLife for the amounts taken, interest, and disgorgement of unlawful profits. Plaintiff makes the following allegations based upon personal knowledge as to himself and his own acts, based on the investigation conducted by his attorneys, and upon information and belief.

## I.  INTRODUCTION

1.  MetLife sells "Group Annuity Contracts" ("GACs") to employee retirement plans ("Retirement Plans") covered under the Employee Retirement Income Security Act of 1974 ("ERISA"). The GACs that MetLife sells to Retirement Plans are intended to provide retirement benefits to employees. GACs have historically been popular with companies seeking to transfer liability for their employees' retirement assets.

2.      This Class Action seeks to hold MetLife accountable for the Company's conversion of more than $500 million in retirement benefits, interest, and unlawful profits over the last 25 years -- depriving retirees of important income in their golden years. MetLife's systematic conversion of retirement annuity benefits betrayed thousands of annuitants and their beneficiaries. (collectively, "Beneficiaries").

3.      MetLife systematically took ownership over the Beneficiaries' annuity assets, ultimately releasing more than $500 million in reserves that belonged to the Beneficiaries, treating the funds as if they belonged to MetLife.

4.      The scope and scale of MetLife's betrayal of trust is particularly egregious in light of its failure to pay death benefits in connection with the Company's *life insurance* business that resulted in the Company paying $500 million in overdue death benefits – and being required to look for similar problems in its annuity business. That MetLife then allowed five years to pass before "discovering" its conversion of over $500 million in *annuity* benefits displays a shocking disregard for the Beneficiaries and the duties MetLife owed to the Beneficiaries.

5.      MetLife has now acknowledged that over the course of 25 years, it failed to keep track of Beneficiaries, failed to contact them, and failed to pay them their benefits when due. Instead of paying the annuity benefits to Beneficiaries or tendering them to states under unclaimed property law, the Company took the money for itself and has acknowledged that it owes as many as 30,000 Beneficiaries more than $500 million in annuity benefits. In admitting that it failed to provide these annuity benefits, MetLife provided additional detail concerning its policies and procedures concerning the payment of annuity benefits – which involved nothing more than sending two letters, one when the Beneficiary turned 65 and one at age 70. If MetLife received no response, it simply took the money for itself.

2

6.      In January 2018, The Company announced that it only "recently" initiated an "ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers"[1] and is still undertaking a process to hire "advisors to conduct a comprehensive analysis."[2]

7.      Plaintiff brings this Complaint to obtain damages and equitable relief, to remedy the harm caused to Plaintiff and the Class by MetLife's conversion of annuity pension benefits owed to retirees.

8.      In addition, Plaintiff brings this Complaint to obtain an accounting of unpaid annuity benefits and a court supervised notice plan on an expedited basis, as detailed in Section below.

## A.    ACCOUNTING OF UNPAID ANNUITY BENEFITS AND COURT SUPERVISED NOTICE

9.      Plaintiff and members of the Class are seniors, whose life spans are by definition limited, and whose resources, in many cases, are also very limited. Conversion of their unpaid annuity benefits pending trial will undoubtedly cause economic hardship to many of them.

10.     MetLife recently claimed that it is still "developing a process that utilizes enhanced outreach techniques, including greater use of technology" in its effort to find Beneficiaries that purportedly could not be located.[3]

11.     While the Company acknowledges that it is now taking steps to strengthen its processes for finding annuitants who are owed benefits, including using additional third-party

---

[1] "MetLife Discloses Accounting Issue, Postpones Earnings Release, Stock Down," *Markets Insider* (Jan. 29, 2018), at http://markets.businessinsider.com/news/stocks/MetLife-Discloses-Accounting-Issue-Postpones-Earnings-Release-Stock-Down-1014496109.
[2] MetLife Q4 2017 Earnings Call Transcript, held on February 14, 2018.
[3] *Id.*

firms specializing in locating missing participants, as of February 14, 2018, the Company was still undertaking a process to hire "advisors to conduct a comprehensive analysis."[4]

12.     Plaintiff and the Class (defined *infra*) request that the Court require MetLife to immediately provide an accounting of: (a) the names and addresses of each member of the Class; (b) the date when annuity benefits were required to be paid to each member of the Class; the amount of annuity benefits that are owed to each Class member; (c) the amount of interest MetLife owes on annuity benefits owed to Class members (including interest on delinquent annuity payments to Class members); (d) any payments actually made to Class members; (e) tax withholdings that MetLife deducted from any payments made to Class members; (e) all efforts to date to locate and notify Class members about benefits and interest which they are due; and (f) an accounting of all annuity monies converted by MetLife for its own use; and (g) an accounting of all profits or investment returns earned on the annuity monies converted by MetLife.

13.     Furthermore, Plaintiff requests that the Court supervise an expedited plan to (a) locate purportedly missing Class members; (b) provide notice to Class members; and (c) provide payment of annuity benefits and interest to Class members.

14.     Plaintiff and the Class seek this relief since it is clear from MetLife's admissions that despite its vast resources and awareness of the problem, it is not moving expeditiously to provide relief to the Class. For example, even two months after acknowledging its failure to pay annuity benefits and conversion of annuity monies to its own use, it was still in the process of hiring advisors to analyze the problem.

15.     The process of identifying, locating, and notifying affected Beneficiaries must proceed quickly and provide accurate information to Beneficiaries, in order to ensure that Class

---

[4] *Id.*

members receive their benefits while they are still alive.

16.     Indeed, as acknowledged by MetLife, this problem "goes back 25 years,"[5] meaning that some unpaid Beneficiaries were 65 years old 25 years ago and would be 90 years old today. Thus, Class members suffer irreparable harm each day that they are deprived of annuity benefits (and interest) due to them from MetLife as their opportunity to enjoy these benefits decreases. Thousands of retirees throughout the United States are without this important retirement income.

17.     This money is needed. The estimated median annual household income among retirees is $32,000, and more than half of retirees (53%) live on less than $50,000.[6] For those retirees whose sole source of income is social security benefits, the so-called golden years are even more daunting. The average monthly social security retirement benefit was recently calculated at $1,368. That amounts to only $16,416 per year.[7] To put that into perspective, the federal poverty line in the United States for a single person household is calculated as an annual income of $12,060. Information provided by MetLife indicates that Class members are owed an average of between $17,500 and $19,166 each.

18.     Moreover, MetLife does not dispute that the converted benefits are owed to Class members, underscoring the likelihood that the Class will prevail on the merits of their claims against the Company.

---

[5] *Id.*

[6] "The Current State of Retirement: A Compendium of Findings about American Retirees," *Transamerica Center for Retirement Studies* (April 2016), at: http://www.transamericacenter.org/docs/default-source/retirees-survey/tcrs2016_sr_retiree_compendium.pdf

[7] Maranjian, Selena, "Americans' Average Social Security at Age 62, 66 and 70," *The Motley Fool* (July 30, 2017), at https://www.fool.com/retirement/2017/07/30/americans-average-social-security-at-age-62-66-and.aspx

19.     The following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery: In the rare instances where MetLife has paid these benefits, it has compensated Class members for their delayed payments by calculating interest at a grossly inadequate rate, far below MetLife's average internal rate of return on its investment of these funds and far below the statutory interest rate in every state. Left unchecked, even after paying the unpaid annuity benefits, MetLife stands to profit handsomely from its unlawful conversion of Class members' funds.

20.     In addition, there can be little doubt that waiting for MetLife to finish its internal review of unpaid claims at its own pace poses additional irreparable harm to Plaintiff and the Class, who are elderly and in immediate need of the benefits to which they are entitled. The balance of equities weighs heavily in favor of Plaintiff and the Class – whose quality of life and life planning are dependent on receiving timely relief from the Court.

## II.    JURISDICTION

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff is a resident of New Jersey. Defendant MetLife is incorporated in the State of Delaware and has its principal place of business in the State of New York. Defendant Metropolitan Life Insurance Company is a New York corporation and has its principal place of business in the State of New York. Defendant Brighthouse Financial, Inc. is incorporated in Delaware and has its principal place of business in the State of New York.

22.     The amount in controversy is unknown but is believed to exceed $500 million.

23.     This Court has personal jurisdiction over Defendants because they each do business in and have significant contacts with this District. This Court also has personal jurisdiction over

Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to jurisdiction of a court of general jurisdiction in New York.

## III.   VENUE

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants are located within in this District, and many of the acts and omissions complained of herein occurred in substantial part in this District.

25.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## IV.   PARTIES

### A.   Plaintiff

26.     Plaintiff Edward Roycroft ("Plaintiff") is an individual residing in Millington, New Jersey. Plaintiff worked at Martindale-Hubbell between March 1970 and March 1999. Through is employment at Martindale-Hubbell, Plaintiff was the beneficiary of a GAC, pursuant to which MetLife was responsible for paying annuity benefits upon his retirement in 1999.

### B.   Defendants

27.     Defendant MetLife, Inc. ("MetLife") is a holding company for Metropolitan Life Insurance Company ("MLIC"). MetLife is organized under the laws of the State of Delaware, with its principal place of business in New York City. Its common stock trades on the New York Stock Exchange under the ticker "MET." As of the date of this Complaint, it has a market capitalization of almost $50 billion.

28.     Defendant MLIC is among the largest providers of annuities in the world, recording $22.4 billion in sales during 2009. MLIC offers annuities which consist of fixed annuities, variable annuities, deferred annuities and immediate annuities. In 1921, MLIC was the first company to engage in the large-scale marketing GACs designed to provide annuity benefits. As of December 31, 2009, MLIV globally managed group annuity assets of $60 billion with $34 billion of transferred pension liabilities and provided benefit payments to over 600,000 annuitants per month. MLIC is a New York corporation with its principal place of business in New York.

29.     Defendant Brighthouse Financial, Inc. ("Brighthouse") was formed by MetLife in 2017 through the spinoff of MetLife's United States retail business, including individual life insurance and annuities for the retail market. Brighthouse is a Delaware corporation with a place of business in New York.

30.     Unless otherwise specified, the term "MetLife" or the "Company" hereafter collectively refers to MetLife, MLIC and Brighthouse.

## V.     FACTUAL ALLEGATIONS

### A.  MetLife is a Major Provider of Group Annuity Contracts

31.     The estimated median annual household income among retirees is $32,000, and more than half of retirees (53%) live on less than $50,000.[8]

32.     "Financially speaking, living on such limited means is not easy," says Catherine Collinson, president of Transamerica Center for Retirement Studies. In fact, 42% say that they are having difficulty making ends meet. "I think for the average American household, $32,000 is

---

[8] Powell, Robert, "Could you Live on just $32,000 per year? Most Retirees Do, USA Today (July 16, 2016), at https://www.usatoday.com/story/money/columnist/powell/2016/07/14/retirees-low-income-social-security/83934392/

doable but will likely result in changes in lifestyle that will be significant for some households….", says David Blanchett, head of retirement research for Morningstar Investment Management.[9]

33.     To ease the financial difficulty of their retired workers, many companies bought Group Annuity Contracts from MetLife designed to pay out annuity benefits to eligible workers. GACs are a type of contract issued by an insurance company to a tax-qualified retirement plan, which guarantees benefits to the annuitants covered under the contract for life or a set period of time, depending on the type of annuity.

34.     According to MetLife, a GAC or "defined benefit group annuity is a type of contract issued by an insurance company to a tax-qualified retirement plan, which guarantees an income to the annuitants covered under the contract for life or a set period of time, depending on the type of annuity."[10]

35.     MetLife is the leading provider of GAC's in the United States, marketing them to employers as a risk mitigation strategy. More specifically, when an employer provides benefits through one of MetLife's GAC's, MetLife assumes complete responsibility for payment of the benefits to retirees; thus, eliminating the employers' administrative burdens and potential legal liabilities for mismanaging plans.

36.     According to Wayne Daniel, head of MetLife's U.S. Pensions, this type of risk management has been a "core element" of MetLife's business for over 90 years, with the Company boasting a 45% market share for GACs and similar risk mitigation strategies relevant to employee pension plans.[11]

---

[9] *Id.*
[10] https://www.metlife.com/pensionscenter/retirement-information/index.html
[11] *Id.*

37.     In addition to the benefits of risk management, MetLife also markets GACs based upon the perceived safety of these contracts and the guarantee that retirees would receive their annuity benefits in a timely and reliable fashion. According the MetLife's "Pension Participation Center" on the Company's website:

> With MetLife, you'll enjoy the confidence and security of being backed by the strength, experience and reputation of one of the world's largest financial services companies. For over 145 years, MetLife has been a leading provider of insurance and financial services throughout the United States and the Latin America, Europe and Asia Pacific regions.
>
> *          *          *
>
> Our longevity and stability ensure that we are well positioned to help protect your financial well-being both now and throughout your retirement. The top credit rating agencies have repeatedly recognized us for our financial strength and claims-paying ability,[1] and we are well-positioned to keep meeting the needs of our customers in the current economic environment. MetLife's corporate vision—to build financial freedom for everyone—means that we can be relied upon to develop first-rate financial products and services for individuals at every stage of life. We are unique in terms of our trusted brand and financial strength.[12]

38.     While MetLife's GACs purported to offer these advantages to employers, a downside for employees is that the requirements for participating in these GAC plans are often complicated and, in some cases, confusing. This, coupled with MetLife's apparent indifference to informing employees on the rules of eligibility, means that (either by default or design), many retirees do not realize that they are eligible for annuity benefits – making them dependent on MetLife's good faith diligence in order to reap the benefits due them.

39.     When an employer engages in a group annuity transaction with MetLife, it pays MetLife millions of dollars to cover the projected liability of the retirement benefits owed to those persons covered by the annuity contract. That money is supposed to be used by MetLife to make annuity payments to retirees. Instead, MetLife took over $500 million of annuity monies for itself.

---

[12] *Id.*

### A.  MetLife Obligations under the GACs

40.     In connection with the GACs, MetLife was responsible to maintain current identification and location information for Participants and Beneficiaries and establishing and implementing protocols, processes and procedures for identifying, locating, and paying benefits.

41.     Indeed, MetLife advises Participants and Beneficiaries that they need not do "anything" in order to start receiving annuity benefits, assuring Beneficiaries that "we are working with your company to make sure we have all the necessary information to make your first payment on time."[13]

42.     Generally, the initiation of payment of benefits pursuant to the GACs were tied to Participants' and Beneficiaries' birthdays at the age of 65, unless MetLife was notified that the Participant or Beneficiary had opted for an early or late retirement.

43.     Despite these clear requirements, between 13,500 and 30,000 retirees covered under MetLife GACs were never notified that they were eligible for benefits and the Company took their annuity benefits, over $500 million dollars.

44.     MetLife has also admitted that its half-hearted attempts to contact these Beneficiaries (once at age 65 and once at age 70.5) and "releasing reserves", MetLife's term for conversion, for unpaid (but owed) benefits amounted to a material weakness in the MetLife's administration of the GACs, as expressed in a slide presentation during MetLife's Q4 2017 earnings call:

---

[13] https://www.metlife.com/pensionscenter/faqs/index.html

**INITIAL STEPS TO REMEDIATE MATERIAL WEAKNESS**

- **Administrative practices not sufficient to allow for reserves to be released**
  - Correct practices of releasing reserves to ensure improvements made
  - Improve communications with annuitants regarding benefits
  - Establish more frequent attempts to contact annuitants and utilize additional commercial locator services
- **Lack of timely escalation throughout the Company**
  - Reviewing escalation practices
  - Will hire third party advisors to conduct comprehensive examination led by Chief Risk Officer

45.    MetLife developed the terms of the GACs which it marketed to the Retirement Plans. These terms generally provided MetLife with broad discretion in fulfilling its duties under these GACs.

46.    MetLife has complete discretion with regard to establishing and implementing protocols, processes and procedures for identifying, locating, and paying benefits and preventing the diversion of liabilities owed to Beneficiaries before they are satisfied.

47.    MetLife's procedures and protocols for notifying Beneficiaries of their eligibility for retirement benefits appear designed to ensure that many Beneficiaries will never be paid so that MetLife can convert annuity benefits to its own use. MetLife simply makes two attempts at contact – one at age 65 and the only other at age 70.5 and no effort to locate individuals when the mailings were returned as undeliverable. These notices did not even identify the former employer of the Beneficiary.  If the Beneficiary did not respond to this half-hearted outreach, it was MetLife's practice to convert the reserve for these benefits and treat the Beneficiaries' retirement benefits as income to itself.

48.    MetLife also exercises discretion on other areas relevant to its GACs. For example, MetLife retains total discretion with regards to: setting interest rates for the purpose of allocating

12

net investment income to plan beneficiaries; determining dividend policy; changing formulas, rates and factors used for the administration of the Plans; calculating lump sum payments to Beneficiaries; and suspending benefit payments in certain circumstances.

**B.     A Promise Broken – 30,000 Retirees Do Not Receive Their Benefits**

49.     Industry analysts and consumer advocates alike were stunned on December 15, 2017 when MetLife announced that its much touted GAC retirement products had failed to pay any annuity benefits to as many as 30,000 retirees. As a result of this colossal failure, the Company further announced that:

> The prior release of group annuity reserves resulted from a material weakness in internal control over financial reporting. MetLife expects to increase reserves in total between $525 million and $575 million pre-tax, to adjust for reserves previously released, as well as accrued interest and other related liabilities. The amount of the reserve increase is based in substantial part on actuarial, legal, statistical, and other assumptions.[14]

50.     Group annuity reserves are the specific sum of money paid by employers to MetLife to cover annuity payments to Beneficiaries. For each Beneficiary, a specific sum of money is paid by an employer to MetLife to cover annuity payments to the given Beneficiary. The group annuity reserves are the monies owed to Beneficiaries by MetLife. By "releasing" reserves to itself and treating the monies as income, MetLife has converted monies belonging to Beneficiaries to its own use and profit.

51.     MetLife blamed its failure to pay annuity benefits on its inability to locate "unresponsive and missing international group annuity annuitants and pension beneficiaries" -- suggesting that MetLife has been aware of the problem for some time.[15] Wall Street analysts assumed that the affected payments could be 10 years or more overdue.

---

[14] MetLife Press Release filed on Form 8-K with the U.S. Securities and Exchange Commission on January 30, 2018.
[15] *Id.*

52.     MetLife further announced that it only "recently" initiated an "ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers."[16]

53.     Indeed, MetLife has acknowledged that it failed to have the processes in place to ensure payment of annuity benefits, as the Company disclosed in an emailed statement:

> When we realized this was a significant issue, we launched an effort to do three things: figure out what happened, strengthen our processes so that we do a better job locating retirees, and promptly pay anyone we find – as we always do …. We are deeply disappointed that we fell short of our own high standards. Our customers deserve better.[17]

54.     MetLife's belated review of its processes, failure to have appropriate processes in place, acknowledgement that its internal controls were deficient, and ultimate admission that it failed to pay benefits to as many as 30,000 retirees demonstrates an egregious breach of trust.

55.     To downplay the seriousness of the problem, MetLife noted that the owed benefits would be generally less than $150 per month – ignoring the fact that $150 per month could be a substantial amount for a retiree. For example, $150 per month would represent over a 12% increase in income for an average retiree receiving only social security benefits.

56.     On January 29, 2018, the Company issued a press release estimating that it would increase its reserves by $525 million to $575 million on a pretax basis to account for the unpaid benefits. In other words, MetLife admitted that it converted between $525 million and $575 million

---

[16] "MetLife Discloses Accounting Issue, Postpones Earnings Release, Stock Down," *Markets Insider* (Jan. 29, 20185), at http://markets.businessinsider.com/news/stocks/MetLife-Discloses-Accounting-Issue-Postpones-Earnings-Release-Stock-Down-1014496109.
[17] Kozlowski, Rob, "MetLife Discloses it Failed to Pay Benefits to Some Retirees from Annuity Buyout," *Penson & Investments* (Dec. 18, 2017), http://www.pionline.com/article/20171218/ONLINE/171219824/metlife-discloses-it-failed-to-pay-benefits-to-some-retirees-from-annuity-buyouts

of annuity monies owed to Beneficiaries to its own use and profit. MetLife also postponed its fourth-quarter earnings report, saying it would revise prior financial reports.

57.     Then, on February 14, 2018, Steven A. Kandarian ("Kandarian"), Chairman and CEO of MetLife shed further light on the scope of the Company's failure during its Q4 2017 conference call, which he opened with a public apology:

> Simply put, this is not our finest hour. We had an operational failure that never should have happened, and it is deeply embarrassing. We are undertaking a thorough review of our practices, processes and people to understand where we fell short and how we can reset the bar at the high-level people have come to expect from us over our 150-year history.[18]

58.     What followed this *mea culpa* could barely have satisfied those Beneficiaries who have been unfairly denied annuity benefits. Kandarian revealed that MetLife's systemic failure to pay retirement benefits to the GAC Participants and Beneficiaries has been going on for approximately **25 years**. This is so notwithstanding that MetLife agreed in 2012, in connection with a market conduct exam regarding similar non-payment of life insurance benefits, to adopt policies and procedures to ensure prompt and accurate payment of annuity benefits.

59.     In addition, Kandarian disclosed MetLife's lack of diligence in paying these retirement benefits, revealing that the entire process involved only two attempts to contact the Beneficiary – once at age 65 and once at age 70.5 – presumably at their last address on file.[19] Kandarian, mentioned no follow-up effort to locate those Beneficiaries who may have changed address. Instead, MetLife shrugged its shoulders and released the reserves for those annuitants – essentially treating their unpaid retirement benefits as income – profiting from the Company's own lack of diligence in administering the GACs.

---

[18] MetLife Q4 2017 Earnings Call Transcript, held on February 14, 2018.
[19] *Id.*

60.     In total, Kandarian announced that it would take a pre-tax reserve charge of $510 million due to the unpaid benefits – slightly below MetLife's estimate of $525 million to $575 million in the Company's January 29, 2018 press release.

61.     This core fact – that MetLife released annuity reserves to itself and treated the money as income – demonstrates a palpable disregard for the retirement needs of Beneficiaries. Not only did MetLife fail to pay annuity benefits to Beneficiaries, it took their annuity benefits for itself.

62.     By taking this money for itself, and not making required distributions to Beneficiaries, MetLife also may have subjected the Beneficiaries to IRS penalties and other payments that they otherwise would not have paid.

63.     Industry analysts called this announcement a "major black eye" for MetLife, the nation's second-largest life insurer by assets.[20]

64.     Maria Vullo, superintendent of the New York Department of Financial Services, commented on the debacle by underscoring MetLife's failure to adapt its protocols for paying claims in the modern era of worker mobility, "What used to be standard protocol for finding retirees who are owed benefits is no longer sufficient."[21]

65.     William Galvin, the Massachusetts Secretary of State, similarly launched an investigation in December 2017. However, unlike MetLife, Massachusetts was quickly able to identify correct addresses for a majority of the unpaid Beneficiaries in Massachusetts. As of March 1, 2018, Massachusetts had already sent letters to those members of the Class and had determined

---

[20] Leslie Scism, "MetLife Says Pension Shortfall Will Prompt Financial Revisions," *Wall Street Journal* (Jan. 29, 2018), at https://www.wsj.com/articles/metlife-says-overdue-pension-benefits-will-prompt-financial-revisions-1517262947
[21] "Ny, Mass. Investigate MetLife over Unpaid Pensions," *Chief Investment Officer* (Dec. 20, 2017), at https://www.ai-cio.com/news/ny-mass-investigate-metlife-unpaid-pensions/

that the average age of the "missing" Beneficiaries in Massachusetts is 72.

66.    MetLife has disclosed that it is responding to questions from its lead state regulator in New York and other state regulators. The Company has also disclosed that the Securities and Exchange Commission enforcement staff "has made an inquiry" about the matter.[22]

67.    Repercussions from MetLife's malfeasance in handling pension benefits continue to reverberate through the Company.  On May 1, 2018, MetLife announced that John Hele, its Chief Financial Officer ("CFO") had been replaced with immediate effect.  The CFO's departure came less than a week after MetLife disclosed it had cut Mr. Hele's pay, citing "[poor] performance in managing financial matters, including material weaknesses in internal control over financial reporting."[23]

68.    Commenting on Mr. Hele's departure, Jay Gelb of Barclay's worried that the CFO's departure – just a day before the Company release of its financial results for Q1 2018 -- "raises obvious questions" about "whether MetLife's string of various charges is over, or if there are more to come."[24]

**C.    MetLife Took Mr. Mr. Roycroft's Annuity Benefits**

69.    Mr. Roycroft lives in Millington, New Jersey and worked at Martindale-Hubbell between March 1970 and March 1999. As a result of his employment at Martindale-Hubbell, Plaintiff was a beneficiary of a MetLife GAC. MetLife was responsible for paying certain annuity benefits to Plaintiff upon his retirement in 1999. Plaintiff was unaware that he was owed these retirement benefits.

---

[22] https://www.wsj.com/articles/metlife-says-overdue-pension-benefits-will-prompt-financial-revisions-1517262947
[23] Gray, Alistair, "MetLife Finance Chief Leaves After Reserves Debacle," *FINANCIAL TIMES* (May 1, 2018), https://www.ft.com/content/34ea5c44-4d4f-11e8-97e4-13afc22d86d4.
[24] *Id.*

70.     Beginning in April 1999, when Plaintiff became entitled to his annuity benefits, MetLife held, exercised dominion over, and denied Plaintiff's right to those annuity benefits, earning an unknown return thereon.

71.     In 2012, at age 70, Plaintiff called MetLife to inquire about his annuity benefits and MetLife responded by letter. In that correspondence, MetLife did not acknowledge that its payment of annuity benefits to Plaintiff was thirteen years late, did not provide any basis whatsoever for Plaintiff to verify the amount owed him, and did not acknowledge that Plaintiff was owed interest or other additional consideration for MetLife's decision to wrongly take possession and ownership over his funds for as much as 13 years.

72.     Finally, on January 14, 2013, MetLife issued a check to Plaintiff in the amount of $2,508.36, as a "lump sum payment in lieu of monthly annuity." According to MetLife, this lump sum payment reflected a 20% federal income tax withholding from the "cash settlement value" of $3,135.46 calculated by and unverified by MetLife. MetLife knew that the annuity benefit of $3,135.46 was supposed to have been paid to Plaintiff thirteen years earlier – on or about Plaintiff's retirement date of April 1, 1999. The check did not include any interest that had accrued during the thirteen years that MetLife had converted his annuity benefit to its own use. Nor did it include any profits wrongfully earned by MetLife on the monies it converted to its own use but that was owed to Plaintiff. Plaintiff deposited the check after receipt.

73.     Plaintiff is now 75 years old and has still not received all that he is due.

74.     Thus, it is clear that MetLife has chosen to compensate late-paid Beneficiaries in amounts which do not reflect the benefit MetLife received from unlawfully retaining money owed to the Plaintiff and the Class or the relevant statutory interest rates.

75.     While the payments to Mr. Roycroft and others were late and failed to include any interest to compensate them, MetLife has admitted that as many as 30,000 Beneficiaries have still not received any payment whatsoever.

**E.     MetLife – A Repeat Offender**

76.     This is not the first time that MetLife has been caught failing to pay out benefits. Five years ago, MetLife was the target of government investigations for unfair and deceptive trade practice regarding non-payment of *life insurance* benefits. MetLife's lack of alacrity in identifying and correcting its failure with respect to *annuity* benefits demonstrates its failure to prudently administer the GACs.

77.     Specifically, MetLife was the subject of a three-year investigation involving more than 30 states that centered on accusations that the Company "lost track" of thousands of deceased individuals with MetLife life insurance policies and/or their beneficiaries and retained unclaimed life insurance payouts.

78.     Making matters worse, the investigation showed that MetLife diligently used the Social Security Administration's Death Master File database to cut off monthly payments to annuity holders but did not use that database to identify deceased life insurance policyholders and pay their beneficiaries. This practice demonstrated a culture at MetLife focused on enhancing bottom-line results at the expense of beneficiaries.

79.     Moreover, MetLife invests and profits from unpaid benefits. When asked about MetLife's failure to pay death benefits, Jack Stollsteimer, director of Pennsylvania's Bureau of Unclaimed Property, commented: "If they're holding it, they're earning a profit on that money, because they're investing it …. Whether it was illegal or not, it was certainly dishonorable. The

people who bought these policies bought them because they trusted MetLife to pay their beneficiaries when they died."[25]

80.     MetLife settled the unpaid death benefit matter in 2012 by agreeing to pay 22 states, including California, Illinois, Florida and Pennsylvania, a total of $40 million in a negotiated settlement. A spokesman for MetLife, John Calagna, said the company also expected to release to beneficiaries around the country about $188 million in overdue death benefits in 2012, and that over the next 17 years it might distribute as much as $438 million in additional overdue death benefits.

81.     The above-described investigation of unpaid death benefits and resulting settlement put MetLife on notice that it had systemic problems with the monitoring of annuity contracts and the timely payment of benefits to those so entitled. The corporate reforms undertaken by MetLife pursuant to the settlement agreement also demonstrates that MetLife understood how to address this problem through business policies and procedures. The fact that MetLife failed to use this knowledge and expertise to insure prompt payment of benefits pursuant to GACs shows the Company's utter disregard for the retirees who had earned and were due retirement benefits from MetLife.

82.     In fact, in addition to the monetary payments related to unpaid *life insurance* benefits, MetLife agreed to the establishment of certain policies and procedures to ensure that *annuity* benefits would be paid:

> Commencing no later than forty-five (45) days prior to the Maturity Date of an Annuity Contract[26] for which the Company is unable to establish an Exception, at

---

[25] Mary Williams Walsh, "MetLife Settles Cases on Benefits," The New York Times (April 23, 2012), at https://www.nytimes.com/2012/04/24/health/policy/metlife-settles-cases-on-benefits.html
[26] In the context of this settlement agreement, Annuity Contracts are limited to those contracts designed to pay a death benefit – not ongoing benefits.

least two (2) letters are sent to an Annuity Contract Owner notifying the owner of the upcoming Maturity Date, stating that the Contract will be annuitized following the Maturity Date if no response is received, and identifying any alternatives to annuitization available under the Contract (e.g., extension of the Maturity Date; surrender of the Contract); [and]

The Company shall immediately commence a Thorough Search for the Annuity Contract Owner if the letters [described above] are returned as undeliverable.[27]

83.     It is shocking that nearly five years after MetLife was found to have failed to pay

life insurance benefits and agreed to commence a thorough search for GAC Participants and

Beneficiaries, that these problems are only now coming to light – further demonstrating MetLife's

breach of trust.

**D.     Additional Red Flags**

84.     An investigation by Plaintiff's counsel has shown that MetLife conducted a

"complete internal audit" of the Company's annuity business in or about 1996. This complete audit

included GACs purchased by employers – including GAC 451, which should have provided

annuity benefits to Plaintiff. This audit should have detected systemic problems with the payment

of annuity benefits – putting MetLife of notice that thousands of workers were in danger of not

receiving the benefits they earned and that were paid for by their former employers.

85.     In addition, the estate of a former Martindale-Hubbell employee in 2012 brought a

FINRA arbitration proceeding against MetLife in January 2016[28] for non-payment of benefits

pursuant to a GAC.[29]

---

[27] 2012 Regulatory Settlement Agreement Between MetLife and Various State Insurance Departments, §§2(f)(i-ii), https://insurance.mo.gov/CompanyAgentSearch/search/documents/MetLifeSettlementAgreement.pdf
[28] FINRA Dispute Resolution No. 15-03033; *Estate of William P. Toland, Sr. vs. Metropolitan Life Insurance Company and Reed Elsevier, Inc.*
[29] On August 3, 2016, MetLife enjoined the FINRA arbitration arguing, among other things, that the dispute was not subject to mandatory arbitration pursuant to FINRA rules and that the matter

86.     According to the FINRA Statement of Claims, William P. Toland, Sr. ("Mr. Toland") was the beneficiary of GAC 451 though his former (34-year) employment with Martindale-Hubbell. Under the terms of GAC 451, his benefits were to commence at the latest in April 1994. Mr. Toland was unaware that he was a beneficiary of GAC 451 and was first notified by MetLife that he was eligible for such benefits in September 2012 – *18 years after his retirement.* Sadly, Mr. Toland passed away in March of 2013 and never received the annuity benefits he was due, with the claim for such benefits passing to his estate.

87.     MetLife's excuse for its failure to pay annuity benefits to Mr. Toland was that it did not have a current address at which it could contact him before 2012 – despite the fact the he and his family had lived at the same home for over 48 years and he was still receiving certain other retirement benefits to which he was entitled through his employment with Martindale-Hubbell.

88.     The incident with Mr. Toland alerted MetLife that the Company was undergoing a systemic failure with the payment of benefits to GAC beneficiaries and underscored the human cost of this failure. Yet, according the MetLife's December 15, 2017 disclosure that at least 30,000 beneficiaries had not received annuity benefits (discussed *supra* at ¶ 49), the Company only "recently" initiated an "ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers."

---

should be tried in the United States District Court for the District of Massachusetts. *See Metropolitan Life Insurance Company v. Michelle Smith, Executrix of the Estate of William P. Toland Sr.*, No. 1:16-cv-11582 (D. Mass). The Court agreed with MetLife and the matter proceeded in the District Court, eventually settling in December 2017.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

89.    Class members had no way of knowing that MetLife had converted annuity benefits to its own use until MetLife disclosed its misconduct in late 2017. Within the period of any applicable statute of limitations, Plaintiff and members of the proposed class could not have discovered through the exercise of reasonable diligence that their annuity benefits had been converted by MetLife. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to conversion of annuity benefits.

## VII.    CLASS ALLEGATIONS

90.    Plaintiff brings this action on behalf of himself and as a class action, pursuant to the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class").

> All Beneficiaries of Plans who were due annuity benefits from MetLife pursuant to Group Annuity Contracts and whose annuity benefits were released from reserves by MetLife.

91.    Excluded from the class are MetLife and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

92.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

93.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under the Federal Rule of Civil Procedure 23.

94.     The members of the Class are so numerous that joinder of all members is impracticable. By MetLife's own admission, those affected by the Company's misdeeds may exceed 30,000 retirees. While the exact number of Class members is unknown to Plaintiff at this time, it can be ascertained only through appropriate discovery.

95.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether Defendants held specific monies for the purpose of paying annuity benefits to Beneficiaries;

- Whether Defendants took monies reserved for paying Beneficiaries' annuity benefits for their own use and profit;

- Whether Defendants were unjustly enriched by their practice of appropriating monies reserved for annuity payments to Beneficiaries;

- The amount, if any, of statutory interest owed to Beneficiaries from Defendants' unlawful conversion of annuity monies; and

- The profit or investment returns earned by Defendants on the use of converted annuity monies.

96.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct complained of herein.

97.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

98.     In addition, the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

99.     This action may also be properly maintained on behalf of the Class proposed herein under the Federal Rule of Civil Procedure 23(b)(2), insofar as the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Conversion

100.    Plaintiff, on behalf of himself and the Class, realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

101.    Plaintiff and the Class were, and still are, the rightful owners and were, and still are, entitled to possession of the group annuity funds unlawfully converted by Defendants.

102.    Plaintiff and the Class's possessory interest in the group annuity funds was, and still is, superior to any interest the Defendants have in the monies it released to itself.

103.    Defendants, despite having knowledge that the funds obtained and held in connection with the Group Annuity Contracts belonged to Plaintiff and the Class, released the unpaid group annuity reserves and reaped financial gain from the wrongful treatment of those funds as income.

104.    By releasing the group annuity reserves, Defendants have unlawfully withheld disbursement of funds belonging to Plaintiff and the Class and have thereby exercised unauthorized control and dominion over the funds to the exclusion of the rights of Plaintiff and the Class.

105.    In doing so, Defendants acted willfully, wantonly, and in knowing and reckless disregard of the superior possessory rights of Plaintiff and the Class.

106.     As a result of the foregoing, Defendants have intentionally converted the group annuity funds belonging to Plaintiff and the Class for Defendants' own use and sole benefit.

107.     The total amount of funds converted by Defendants is capable of specific identification and is subject to contractual disbursement under the Group Annuity Contracts.

108.     As a result of the conversion by Defendants, Plaintiff seeks, on behalf of himself and the Class, a judgment in an amount not yet fully ascertained, but which Plaintiff is informed and believes, and alleges thereon, exceeds $500 million.

## SECOND CLAIM FOR RELIEF
### Unjust Enrichment

109.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

110.     As the result of the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

111.     Equity and good conscience require that Defendants make restitution by disgorging all monies, profits and gains which they have unjustly obtained or will unjustly obtain in the future at the expense of Plaintiff and the Class and pay these funds to Plaintiff and the Class.

## THIRD CLAIM FOR RELIEF
### Accounting

112.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

113.     Defendants have wrongly taken possession of monies owed to Plaintiff and Beneficiaries.

114.     Plaintiff will likely have evidentiary support after a reasonable opportunity for further investigation or discovery to show that Defendants earned substantial profits by reinvesting the monies wrongfully taken from Beneficiaries.

115.     Plaintiff and the Class are entitled to an accounting with respect to all funds owed or owing to the Plaintiff and the Class.

**FOURTH CLAIM FOR RELIEF**
**Constructive Trust**

116.     Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

117.     Defendants have unjustly enriched themselves at the expense of Plaintiff and the Class.

118.     Plaintiff and the Class are entitled to the imposition of a constructive trust on all amounts by which Defendants have unjustly enriched themselves.


**IX.     PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, pray for relief as follows:

a.   Certifying this action as a class action pursuant to Fed. R. Civ. P. 23;

b.   Ordering declaratory and injunctive relief as necessary and appropriate, including enjoining Defendant from its repeated failures to pay annuity benefits to Plaintiff and the Class;

c.   Issuing a preliminary injunction prohibiting MetLife from settling claims for unpaid pension benefits in a manner that would require the Beneficiaries to waive any right, including but not limited to, rights to interest, disgorgement of profits or any other

remedies allowed by law or equity.

d.  Issuing a mandatory injunction to require MetLife to pay the costs of retaining outside firms to (a) locate Beneficiaries eligible for benefits under the GACs; (b) provide notice to Beneficiaries of the GAC benefits they are entitled to; and (c) distribute GAC benefits owed by MetLife to eligible Beneficiaries.

e.  Awarding, declaring or otherwise providing Plaintiff and the Class all relief under applicable law, that the Court deems proper and such appropriate equitable relief as the Court may order, including compensatory and punitive damages, an accounting, constructive trust, surcharge, restitution, disgorgement of profits, equitable lien, repayment of IRS penalties or fines; or other remedy;

f.  Awarding Plaintiff's counsel attorneys' fees, reimbursement of out-of-pocket litigation expenses, expert witness fees, and other costs pursuant to the common fund doctrine, and/or any other applicable doctrine;

g.  Awarding pre-judgment and post-judgment interest; and

h.  Awarding such other and further relief as may be just and proper.


June 18, 2018                     **BAILEY & GLASSER LLP**

                                  /s/ Kevin Barrett_____
                                  Kevin Barrett (2196343)
                                  137 Betsy Brown Road
                                  Port Chester, NY 10573
                                  Tel: (646) 776-8580
                                  kbarrett@baileyglasser.com

                                  Gregory Y. Porter, *pro hac vice* to be filed
                                  BAILEY & GLASSER LLP
                                  1054 31st Street, NW
                                  Suite 230
                                  Washington, DC 20007

Tel: (202) 463-2101

Norman Berman, *pro hac vice* to be filed
Nathaniel L. Orenstein, *pro hac vice* to be filed
Mark A. Delaney, *pro hac vice* to be filed
John H. Sutter, *pro hac vice* to be filed
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300

*Attorneys for Plaintiffs*