## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD ROYCROFT, individually and on behalf of all those similarly situated, | |
| Plaintiff, | Case No. 1:18-cv-05481 (AKH) (BCM) |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| METLIFE, INC. and METROPLITAN LIFE INSURANCE COMPANY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Edward Roycroft ("Plaintiff"), individually and on behalf of all those similarly situated, files this Amended Class Action Complaint against MetLife, Inc. and Metropolitan Life Insurance Company (collectively, "MetLife" or the "Company") for unpaid interest and unjust enrichment relating to the Company's failure to timely pay annuity benefits to retirees.  Plaintiff also seeks an accounting from MetLife to calculate interest and unlawful profits.  Plaintiff makes the following allegations based upon personal knowledge as to himself and his own acts, based on the investigation conducted by his attorneys, and upon information and belief.

### I.      INTRODUCTION

1.      MetLife sells Group Annuity Contracts ("GACs") to employee retirement plans ("Retirement Plans") covered under the Employee Retirement Income Security Act of 1974 ("ERISA") — although GACs themselves are not governed by ERISA.  GACs are a type of contract issued by an insurance company to a tax-qualified retirement plan which guarantees benefits to the employees covered under the contract, known as "Annuitants," for life or a set

period depending on the type of annuity.  GACs have historically been popular with companies seeking to transfer liability for their employees' retirement assets.

2.       This Class Action seeks to hold MetLife accountable for the Company's failure to timely pay annuity benefits, depriving retirees of important income in their golden years.  MetLife's systematic failure to timely pay retirement annuity benefits betrayed thousands of Annuitants and their Beneficiaries.

3.       MetLife's administration of annuity retirement benefits suffers from deep and systematic flaws.  But these flaws are features not bugs.  That is, MetLife's administration of annuity benefits is designed to fail so that MetLife can delay payments, convert annuity benefits for its own use, and profit therefrom.  MetLife admitted to converting over $500 million in annuity benefits from reserves held to pay those benefits to assets on its own balance sheet.  It made little or no effort to locate Annuitants or their designated Beneficiaries.   And even when it paid annuity benefits it failed to pay interest on back-benefits owed, as is the case with Plaintiff here.

4.       The scope and scale of MetLife's betrayal of trust is particularly egregious considering that it comes on the heels of MetLife's failure to pay death benefits in connection with the Company's *life insurance* business.  That resulted in the Company paying $500 million in overdue death benefits—and a requirement under the terms of a Regulatory Settlement Agreement to look for similar problems in its annuity business.  That MetLife then allowed five years to pass before acknowledging conversion of over $500 million in *annuity* benefits displays a shocking disregard for the Beneficiaries and the duties MetLife owed to the Beneficiaries.  That MetLife did not pay interest on the benefits it owes means that it is failing to compensate annuitants and their designated beneficiaries for the lost use of the benefits that have been owed to them for years.

5.      MetLife has now confirmed that over the course of 25 years, it failed to keep track of Beneficiaries, failed to contact them, and failed to pay them their benefits when due.  Later, when it was required to escheat the funds to states under unclaimed property laws, the Company retained the money for itself.  MetLife has acknowledged that it owes as many as 30,000 Beneficiaries more than $500 million in annuity benefits.  In admitting that it failed to provide these annuity benefits, MetLife provided additional detail about its policies and procedures concerning the payment of annuity benefits—which apparently involved nothing more than sending two letters, one when the beneficiary turned 65 and one at age 70½.

6.      Making matters even more egregious, on those occasions in which MetLife would be contacted by a beneficiary long after retirement age to enquire about potential benefits, MetLife would effectively try to minimize the Annuitants' recovery, sending them settlement forms for amounts calculated through an unexplained formula which did not include any accrued interest on the unpaid benefits.  In some cases, these settlements represented a fraction of what was owed.  Notably, these tactics were used against retirees, many of which are more than 70 years old.

7.      Throughout the 25 years of non-payment of annuity benefits, MetLife has had an ongoing obligation to review its products and processes, but in January 2018, the Company announced that it only "recently" initiated an "ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers"[1] and is still undertaking a process to hire "advisors to conduct a comprehensive analysis."[2]

_____

[1] RTT News, "MetLife Discloses Accounting Issue, Postpones Earnings Release, Stock Down," *MarketsInsider* (Jan. 29, 20185), at http://markets.businessinsider.com/news/stocks/MetLife-Discloses-Accounting-Issue-Postpones-Earnings-Release-Stock-Down-1014496109.

[2] MetLife Q4 2017 Earnings Call Transcript, held on February 14, 2018.

8.    Plaintiff brings this Complaint to obtain interest and equitable relief, and to remedy the harm caused to Plaintiff and the Class (defined *infra*) by MetLife's failure to timely pay annuity pension benefits owed to retirees.

9.    In addition, Plaintiff brings this Complaint to obtain an accounting of delayed annuity benefits and MetLife's profits from delayed and unpaid annuity benefits and a court-supervised notice plan on an expedited basis, as detailed in Section A, *infra*.

A.    **ACCOUNTING OF UNPAID ANNUITY BENEFITS AND COURT-SUPERVISED NOTICE**

10.   Plaintiff seeks an accounting.   Plaintiff and members of the Class are seniors whose remaining years of life are limited and whose resources, in many cases, are also very limited. Delayed payment of their annuity benefits has caused economic hardship and irreparable harm for many of them.

11.   While the Company claims that it is now taking steps to strengthen its processes for finding annuitants who are owed benefits, including using additional third-party firms specializing in locating missing Beneficiaries, as of February 14, 2018, the Company was still undertaking a process to hire "advisors to conduct a comprehensive analysis."[3]

12.   Plaintiff and the Class request that the Court require MetLife to provide an accounting of: (a) the names and addresses of each member of the Class; (b) the date when annuity benefits were required to be paid to each member of the Class; and (c) the amount of annuity benefits that are owed to each Class member. Plaintiff and the Class also requests that the Court require: (a) MetLife provide an accounting of the amount of interest it owes on annuity benefits payable to Class members—including interest on delinquent annuity payments to Class members—and its methodology for calculating this interest; (b) any payments actually made to Class members; (c)

---

[3] *Id.*

tax withholdings that MetLife deducted from any payments made to Class members; (d) all efforts to date to locate and notify Class members about benefits and interest which they are due; (e) an accounting of all annuity monies converted by MetLife for its own use; and (f) an accounting of all interest owed and investment returns earned on the annuity monies not paid by MetLife.

13.     Plaintiff and the Class seek this relief since MetLife's admissions make clear that despite its vast resources and awareness of the problem, MetLife has not moved expeditiously to provide relief to the Class.  For example, even two months after acknowledging its failure to pay annuity benefits and conversion of annuity benefits to its own use, MetLife had not hired advisors to analyze the problem, let alone begin payments to the many elderly Annuitants and Beneficiaries.

14.     The process of identifying, locating, and notifying affected Annuitants and Beneficiaries must proceed quickly and provide accurate information to Annuitants and Beneficiaries, in order to ensure that Class members receive their full benefits as promptly as possible.

15.     Indeed, as acknowledged by MetLife, this problem "goes back 25 years,"[4] meaning that some unpaid Annuitants were 65 years old twenty-five years ago and, if living, are 90 years old today.  Thus, Class members suffer irreparable harm each day that they are deprived of annuity benefits (and interest) due to them from MetLife as their opportunity to enjoy these benefits decreases.  Thousands of retirees throughout the United States are without this important retirement income.

16.     This money is needed.  The estimated median annual household income among retirees is $32,000 and more than half of retirees (53%) live on less than $50,000.[5]  Many retirees face

---

[4] *Id.*

[5] Powell, Robert, "Could you Live on just $32,000 per year? Most Retirees Do, USA Today (July 16, 2016), at https://www.usatoday.com/story/money/columnist/powell/2016/07/14/retirees-low-income-social-security/83934392/.

formidable challenges in ensuring that they have adequate income to last their lifetimes.[6] "Financially speaking, living on such limited means is not easy," says Catherine Collinson, president of Transamerica Center for Retirement Studies.  In fact, 42% of retirees say that they are having difficulty making ends meet.  "I think for the average American household, $32,000 is doable but will likely result in changes in lifestyle that will be significant for some households….", says David Blanchett, head of retirement research for Morningstar Investment Management.[7]

17.     For those retirees whose sole source of income is social security benefits, the so-called golden years are even more daunting.  The average monthly social security retirement benefit was recently calculated at $1,368.  That amounts to only $16,416 per year.[8] To put that into perspective, the federal poverty line in the United States for a single person household is an annual income of $12,060.  Information provided by MetLife indicates that Class members are owed an average of between $17,500 and $19,166 each.

18.     Moreover, MetLife does not dispute that benefits are owed to Class members, underscoring the likelihood that the Class will prevail on the merits of their claims against the Company.

---

[6] "The Current State of Retirement: A Compendium of Findings about American Retirees," *Transamerica Center for Retirement Studies* (April 2016), at http://www.transamericacenter.org/docs/default-source/retirees-survey/tcrs2016_sr_retiree_compendium.pdf.

[7] *Id*. Powell, Robert, "Could you Live on just $32,000 per year? Most Retirees Do, USA Today (July 16, 2016), at https://www.usatoday.com/story/money/columnist/powell/2016/07/14/retirees-low-income-social-security/83934392/.

[8] Maranjian, Selena, "Americans' Average Social Security at Age 62, 66 and 70," *The Motley Fool* (July 30, 2017), at https://www.fool.com/retirement/2017/07/30/americans-average-social-security-at-age-62-66-and.aspx.

19.     The following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

20.     MetLife's process for corresponding with the affected beneficiaries is generally very generic and these form letters could easily be confused with junk mail, causing beneficiaries not to claim their benefits.  The correspondence is also (either by design or intent) confusing and fails to provide the information necessary for beneficiaries to understand that their benefits are overdue, that MetLife has derived improper benefits from keeping those funds, or that interest is owed on the funds.

21.     In the rare instances where MetLife has paid these benefits, it has inadequately compensated Class members for their delayed payments by either providing no interest or calculating interest at a grossly inadequate rate, far below MetLife's average internal rate of return on its investment of these funds and far below the statutory interest rate in every state. MetLife has also allegedly failed to properly calculate annuity benefits and tax payments. Left unchecked, even after acknowledging its malfeasance, MetLife stands to profit handsomely from its deceptive practices and unlawful retention of Class members' funds.

22.     In addition, there can be little doubt that waiting for MetLife to finish its internal review of unpaid claims at its own pace poses additional irreparable harm to Plaintiff and the Class, who are elderly and in immediate need of the benefits to which they are entitled.  The balance of equities weighs heavily in favor of Plaintiff and the Class—whose quality of life and life planning are dependent on receiving timely relief from the Court.

## II.      PARTIES

### A.      Plaintiff

23.      Plaintiff Edward Roycroft ("Mr. Roycroft" or "Plaintiff") is an individual residing in Millington, New Jersey.  Mr. Roycroft worked at Martindale-Hubbell, Inc. ("Martindale-Hubble") for almost thirty years, from March 1970 to March 1999.  Through his employment at Martindale-Hubbell, Mr. Roycroft was an annuitant under Group Annuity Contract #000451("GAC 451"), pursuant to which MetLife was responsible for paying annuity benefits to Mr. Roycroft when he retired in 1999 or, at the latest, when Mr. Roycroft turned 65 in 2007.

### B.      Defendants

24.      Defendant MetLife, Inc. ("MetLife") is a corporation organized under the laws of the state of Delaware with its principal place of business located at 200 Park Avenue, New York, 10166. MetLife is the holding company for its subsidiary Metropolitan Life Insurance Company ("MLIC").  MetLife's common stock trades on the New York Stock Exchange under the ticker "MET."  As of the date of this Complaint, it has a market capitalization of almost $50 billion. According to MetLife 2017 Annual Report it is one of the world's leading financial service companies providing annuities and employee benefits.

25.      Defendant MLIC is a corporation organized under the laws of the state of New York with its principal place of business located at 200 Park Avenue, New York, New York 10166, where it shares office with its parent company, MetLife.  MLIC is a wholly-owned subsidiary of MetLife and acts as an instrument of the Company.

26.      MLIC is among the largest providers of annuities in the world, recording $22.4 billion in sales during 2009.  MLIC offers annuities which consist of fixed annuities, variable annuities, deferred annuities and immediate annuities.  In 1921, MLIC was the first company to engage in

the large-scale marketing of GACs designed to provide annuity benefits.  As of December 31, 2009, MLIC managed group annuity assets of $60 billion with $34 billion of transferred pension liabilities and provided benefit payments to more than 600,000 annuitants per month.

27.     Unless otherwise specified, the term "MetLife" or the "Company" or "Defendants" refers to MetLife and MLIC, collectively.

### III.     JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Plaintiff is a resident of New Jersey.  Defendant MetLife is incorporated in the state of Delaware and has its principal place of business in the state of New York.  Defendant MLIC is a New York corporation and has its principal place of business in the state of New York.

29.     The amount in controversy is unknown but is believed to be in the tens of millions.

30.     This Court has personal jurisdiction over Defendants because they each do business in and have significant contacts with this District.  This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to jurisdiction of a court of general jurisdiction in New York.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants are located within in this District, and many of the acts and omissions complained of herein occurred in substantial part in this District.

32.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.    FACTUAL ALLEGATIONS

### A.    MetLife is a Major Provider of Group Annuity Contracts

33.    To avoid pension liabilities, many companies bought GACs from MetLife designed to pay out annuity benefits to covered employees.  MetLife is one of the leading providers of GACs in the United States, marketing them to employers as a risk mitigation strategy.  More specifically, when an employer transfers its pension liabilities for some or all of its pension plan participants through one of MetLife's GACs, MetLife assumes complete responsibility for payment of the benefits to retirees, thus eliminating the employers' administrative burdens and assuming all liabilities for paying pension benefits.

34.    According to Wayne Daniel, head of MetLife's U.S. Pensions, this type of risk management has been a "core element" of MetLife's business for over 90 years, with the Company boasting a 45% share of the market for group annuities and similar risk mitigation strategies relevant to employee pension plans.[9]

35.    In addition to the benefits of risk management, MetLife also markets GACs based upon the perceived safety of these contracts and the guarantee that retirees would receive their annuity benefits in a timely and reliable fashion.  According the MetLife's "Pension Participation Center" on the Company's website:

> With MetLife, you'll enjoy the confidence and security of being backed by the strength, experience and reputation of one of the world's largest financial services companies.  For over 145 years, MetLife has been a leading provider of insurance and financial services throughout the United States and the Latin America, Europe and Asia Pacific regions.
>
> *        *        *
>
> Our longevity and stability ensure that we are well positioned to help protect your financial well-being both now and throughout your retirement.  The top credit rating

---

[9] https://www.plansponsor.com/thought-leadership/pension-perspective

agencies have repeatedly recognized us for our financial strength and claims-paying ability, and we are well-positioned to keep meeting the needs of our customers in the current economic environment.  MetLife's corporate vision—to build financial freedom for everyone—means that we can be relied upon to develop first-rate financial products and services for individuals at every stage of life.  We are unique in terms of our trusted brand and financial strength.[10]

36.     Although MetLife's GACs purported to offer these advantages to employers, a downside for employees is that these GACs are not always disclosed to annuitants, often complicated and, in some cases, confusing.  This, coupled with MetLife's apparent indifference to informing employees on the rules of eligibility, means that many retirees do not realize that they are eligible for annuity benefits—making them dependent on MetLife's good-faith diligence in order to enjoy the benefits due them.

37.     The employers who entered into group annuity transactions with MetLife performed on the contracts by paying MetLife millions of dollars to cover the projected liability of the retirement benefits owed to those persons covered by the annuity contract.  That money was supposed to be used by MetLife to make annuity payments to retirees.  Instead, MetLife took over $500 million of annuity benefits for itself.

### B.      MetLife—A Repeat Offender

38.     This is not the first time that MetLife has been caught failing to pay out benefits.  Five years ago, MetLife was the target of government investigations for unfair and deceptive trade practice regarding non-payment of *life insurance* benefits.  MetLife's lack of alacrity in identifying and correcting its failure with respect to *life insurance* benefits foreshadowed its continuing failure to prudently pay *annuity* benefits.

---

[10]https://www.metlife.com/pensionscenter/welcome/about-us.html

39.     Specifically, MetLife was the subject of a three-year investigation involving more than 30 states that centered on accusations that the Company "lost track" of thousands of deceased individuals with MetLife life insurance policies and/or their beneficiaries and retained unclaimed life insurance payouts.

40.     Making matters worse, the investigation showed that MetLife diligently used the Social Security Administration's Death Master File database to cut off monthly payments to annuity holders but did not use that database to identify deceased life insurance policyholders and pay their beneficiaries.  This practice demonstrated a culture at MetLife focused on enhancing bottom-line results at the expense of beneficiaries. Moreover, MetLife invests and profits from these unpaid benefits.  When asked about MetLife's failure to pay death benefits, Jack Stollsteimer, director of Pennsylvania's Bureau of Unclaimed Property, commented: "If they're holding it, they're earning a profit on that money, because they're investing it …. Whether it was illegal or not, it was certainly dishonorable.  The people who bought these policies bought them because they trusted MetLife to pay their beneficiaries when they died."[11]

41.     MetLife settled the unpaid death benefit matter in 2012 by agreeing to pay 22 states, including California, Illinois, Florida, and Pennsylvania, a total of $40 million in a negotiated settlement.  A spokesman for MetLife, John Calagna, said the Company also expected to release to beneficiaries around the country about $188 million in overdue death benefits in 2012, and that over the next 17 years it might distribute as much as $438 million in additional overdue death benefits.

---

[11] Mary Williams Walsh, "MetLife Settles Cases on Benefits," *The New York Times* (April 23, 2012), at https://www.nytimes.com/2012/04/24/health/policy/metlife-settles-cases-on-benefits.htmlhttps://www.nytimes.com/2012/04/24/health/policy/metlife-settles-cases-on-benefits.html.

42.     The above-described investigation of unpaid death benefits and resulting settlement put MetLife on notice that it had systemic problems with the monitoring of beneficiaries, including of annuity contracts, and the timely payment of benefits to those so entitled.  The corporate reforms undertaken by MetLife pursuant to the settlement agreement also demonstrate that MetLife understood how to address this problem through business policies and procedures.  The fact that MetLife failed to use this knowledge and expertise to ensure prompt payment of benefits pursuant to GACs shows the Company's utter disregard for the retirees who had earned and were due retirement benefits from MetLife.

43.     In fact, in addition to the monetary payments related to unpaid *life insurance* benefits, MetLife agreed to the establishment of certain policies and procedures to ensure that *annuity* benefits would be paid:

> Commencing no later than forty-five (45) days prior to the Maturity Date of an Annuity Contract[12] for which the Company is unable to establish an Exception, at least two (2) letters are sent to an Annuity Contract Owner notifying the owner of the upcoming Maturity Date, stating that the Contract will be annuitized following the Maturity Date if no response is received, and identifying any alternatives to annuitization available under the Contract (e.g., extension of the Maturity Date; surrender of the Contract); [and]
>
> The Company shall immediately commence a Thorough Search for the Annuity Contract Owner if the letters [described above] are returned as undeliverable.[13]

---

[12] In the context of this settlement agreement, Annuity Contracts are limited to those contracts designed to pay a death benefit—not ongoing benefits.

[13] 2012 Regulatory Settlement Agreement Between MetLife and Various State Insurance Departments, §§2(f)(i-ii), https://insurance.mo.gov/CompanyAgentSearch/search/documents/MetLifeSettlementAgreement.pdf.

44.     It is shocking that nearly five years after MetLife was found to have failed to pay life insurance benefits and agreed to commence a thorough search for GAC Beneficiaries, that these problems are only now coming to light further demonstrating MetLife's breach of trust.

### C.     MetLife's Obligations under the GACs

45.     In connection with the GACs, MetLife was responsible for maintaining current identification and location information for Annuitants and Beneficiaries and establishing and implementing protocols, processes, and procedures for identifying and locating them, and paying their benefits.

46.     Indeed, MetLife advises Annuitants that they need not do "anything" in order to start receiving annuity benefits, assuring Annuitants that "we are working with your company to make sure we have all the necessary information to make your first payment on time."[14]

47.     Generally, the initiation of payment of benefits pursuant to the GACs were tied to Annuitants' birthdays at the age of 65, unless MetLife was notified that the Annuitant had opted for an early or late retirement. Despite these clear requirements, between 13,500 and 30,000 retirees covered under MetLife GACs were never notified that they were eligible for benefits and MetLife took their annuity benefits, converting more than $500 million of these owed benefits to earnings and revenues.

48.     MetLife has admitted that it only engaged in half-hearted attempts to contact these Annuitants sending letters only once at age 65 and again at age 70½.

49.     If annuity benefits went unclaimed by age 70½, MetLife's annuity payment system automatically presumed the Annuitant dead without ever checking public death files, as it was required to do under its consent decree with regulators.  That is, the annuity database was

---

[14] https://www.metlife.com/pensionscenter/faqs/index.html.

programmed to assume death at age 70½ if the annuity had not been claimed.  Further, upon presuming the death of the Annuitant, MetLife made no attempt to contract designated Beneficiaries of the Annuitant.  And MetLife did not escheat the unclaimed annuity benefits as required under unclaimed property statutes.

50.     MetLife's procedures and protocols for notifying Annuitants and Beneficiaries of their eligibility for retirement benefits appear designed to ensure that many Annuitants and Beneficiaries will never be paid, allowing MetLife to convert annuity benefits to its own use.  MetLife allegedly made only two attempts at contact—one attempt at age 65 and the only other attempt at age 70½—and it made no effort to locate individuals whose mailings were returned as undeliverable.  In addition, these notices were generic in form and (even if they do make it to the beneficiary) could easily be mistaken for junk mail, as the initial contact is a one-page letter sent without warning by regular mail delivery.

51.     The investigation of Plaintiff's counsel has found the initial, unexpected contact for some Annuitants owed past payments simply noted that the Annuitant had reached 70 years of age and "may be eligible for retirement benefits" (similar to phrases such as "you may already be a winner" which pervades solicitations delivered by mail).  They are also referred to the Company's "Customer Sales and Service Group" for further correspondence  There is no mention of the past due amount owed to the Annuitant or interest on that amount or further explanation for why they were getting this notice at 70—when they retired years ago.

52.     If Annuitants responded and objected that MetLife's offer of settlement was unfair, the Company responded with letters disputing that claim and would still be silent as to whether the Annuitants were owed interest or even that the payments were late.

53.     Moreover, MetLife's "releasing reserves" for unpaid (but owed) benefits amounted to a material weakness in MetLife's administration of the GACs, as expressed in a slide presentation during MetLife's 2017 fourth quarter earnings call:[15]

---

**INITIAL STEPS TO REMEDIATE MATERIAL WEAKNESS**

▪ **Administrative practices not sufficient to allow for reserves to be released**

    o  Correct practices of releasing reserves to ensure improvements made

    o  Improve communications with annuitants regarding benefits

    o  Establish more frequent attempts to contact annuitants and utilize additional commercial locator services

▪ **Lack of timely escalation throughout the Company**

    o  Reviewing escalation practices

    o  Will hire third party advisors to conduct comprehensive examination led by Chief Risk Officer

---

54.     MetLife has complete discretion with regard to establishing and implementing protocols, processes, and procedures for identifying and locating Annuitants and Beneficiaries and paying their benefits and preventing the diversion of liabilities owed to Annuitants and Beneficiaries before they are satisfied.

55.     MetLife also exercises discretion in other areas relevant to its GACs. For example, MetLife retains total discretion to: set interest rates for the purpose of allocating net investment income to plan Annuitants and Beneficiaries; determine dividend policy; change formulas, rates, and factors used for the administration of the plans; calculate lump sum payments to Annuitants and Beneficiaries; and suspend benefit payments in certain circumstances.

---

[15] See, MetLife Form 8-K, February 13, 2018.

### D.     A Promise Broken—30,000 Retirees Do Not Receive Their Benefits

56.     Industry analysts and consumer advocates alike were stunned on December 15, 2017 when MetLife announced that its much touted GAC retirement products had failed to pay annuity benefits to as many as 30,000 retirees.  As a result of this colossal failure, the Company further announced that:

> The prior release of group annuity reserves resulted from a material weakness in internal control over financial reporting.  MetLife expects to increase reserves in total between $525 million and $575 million pre-tax, to adjust for reserves previously released, as well as accrued interest and other related liabilities.  The amount of the reserve increase is based in substantial part on actuarial, legal, statistical, and other assumptions.[16]

57.     For each beneficiary, a specific sum of money is paid by an employer to MetLife to cover annuity payments to the given beneficiary.  The specific sum of money paid by employers to MetLife to cover annuity payments to beneficiaries constitutes the bare minimum group annuity reserve at the time of the payment, and reserve liability would grow as the obligation continues. The group annuity reserves are the monies owed to beneficiaries by MetLife.  By "releasing" reserves to itself and treating the monies as income, MetLife took monies belonging to Beneficiaries for its own use and profit.  Having converted those liabilities to income, MetLife caused its sworn annual statements to be false.  Those inflated financial results impacted both risk-based capital ("RBC") and reported surplus.  These are results that must be factored in the determination of whether or not stockholder dividends are "reasonable incentives."

58.     MetLife blamed its failure to pay annuity benefits on its inability to locate "unresponsive and missing international group annuity annuitants and pension beneficiaries" — suggesting that

---

[16] MetLife Press Release filed on Form 8-K with the U.S. Securities and Exchange Commission on January 30, 2018.

MetLife has been aware of the problem for some time.[17] Wall Street analysts assumed that the affected payments could be ten years or more overdue.[18]

59.     MetLife further announced that it only "recently" initiated an "ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers."[19]

60.     Indeed, MetLife has acknowledged that it failed to have the processes in place to ensure payment of annuity benefits:

> "When we realized this was a significant issue, we launched an effort to do three things: figure out what happened, strengthen our processes so that we do a better job locating retirees, and promptly pay anyone we find – as we always do …. We are deeply disappointed that we fell short of our own high standards.  Our customers deserve better."[20]

61.     MetLife's belated review of its processes, failure to have appropriate processes in place, acknowledgement that its internal controls were deficient, and ultimate admission that it failed to pay benefits to as many as 30,000 retirees demonstrates an egregious breach of trust.

62.     To downplay the seriousness of the problem, MetLife noted that the owed benefits would be generally less than $150 per month—ignoring the fact that $150 per month could be a

---

[17] *Id.*

[18] http://online.wsj.com/public/resources/documents/print/WSJ_-B001-20171216.pdf

[19] "MetLife Discloses Accounting Issue, Postpones Earnings Release, Stock Down," *Markets Insider* (Jan. 29, 2018), at http://markets.businessinsider.com/news/stocks/MetLife-Discloses-Accounting-Issue-Postpones-Earnings-Release-Stock-Down-1014496109.

[20] Kozlowski, Rob, "MetLife Discloses It Failed to Pay Benefits to Some Retirees from Annuity Buyout," *Pensions & Investments* (Dec. 18, 2017), at http://www.pionline.com/article/20171218/ONLINE/171219824/metlife-discloses-it-failed-to-pay-benefits-to-some-retirees-from-annuity-buyouts.

substantial amount for a retiree.  For example, $150 per month would represent a 12% increase in income for an average retiree receiving only social security benefits.

63.     On January 29, 2018, the Company issued a press release estimating that it would increase its reserves by $525 million to $575 million on a pretax basis to account for the unpaid benefits. In other words, MetLife admitted that it converted between $525 million and $575 million of annuity monies owed to Beneficiaries to its own use and profit.  MetLife also postponed its fourth-quarter earnings report, saying it would revise prior financial reports.

64.     Then, on February 14, 2018, Steven A. Kandarian ("Kandarian"), Chairman and CEO of MetLife shed further light on the scope of the Company's failure during its fourth quarter 2017 conference call, which he opened with a public apology:

> Simply put, this is not our finest hour.  We had an operational failure that never should have happened, and it is deeply embarrassing.  We are undertaking a thorough review of our practices, processes and people to understand where we fell short and how we can reset the bar at the high-level people have come to expect from us over our 150-year history.[21]

65.     What followed this *mea culpa* laid bare the ongoing mistreatment of Beneficiaries who have been unfairly denied annuity benefits.  Kandarian revealed that MetLife's systemic failure to pay retirement benefits to the GAC Beneficiaries has been going on for approximately ***25 years***. Moreover, MetLife agreed in 2012, in connection with a market conduct exam regarding similar non-payment of life insurance benefits, to adopt policies and procedures to ensure prompt and accurate payment of annuity benefits.  Notwithstanding MetLife's promise in this regard, it failed to pay more than $500 million in pension annuity benefits.

---

[21] MetLife Q4 2017 Earnings Call Transcript, held on February 14, 2018.

66.     In addition, Kandarian disclosed MetLife's lack of diligence in paying these retirement benefits, revealing that the entire process involved only two attempts to contact the beneficiary—once at age 65 and once at age 70½ at their last known address.[22]  Kandarian mentioned no follow-up effort to locate those Annuitants and Beneficiaries who may have changed their addresses. Instead, MetLife shrugged its shoulders and kept those funds for itself.  Ultimately, MetLife released the reserves for those annuitants—essentially treating their unpaid retirement benefits as income—profiting (as well as inflating RBC and reported surplus)  based on the Company's own lack of diligence—or worse, calculated misfeasance—in administering the GACs.[23]

67.     In total, Kandarian announced that it would take a pre-tax reserve charge of $510 million due to the unpaid benefits—slightly below MetLife's estimate of $525 million to $575 million in the Company's January 29, 2018 press release.

68.     This core fact—that MetLife released annuity reserves and treated the money as income—demonstrates a palpable disregard for the retirement needs of Annuitants and Beneficiaries.  Not only did MetLife fail to pay annuity benefits to Annuitants and Beneficiaries, it took their annuity benefits for itself, and even when it did pay benefits years after they were due, MetLife did not pay interest on the back benefits owed.

69.     By taking this money for itself, and not making required distributions to Beneficiaries, MetLife also may have subjected the Beneficiaries to IRS penalties and other payments that they otherwise would not have paid.

---

[22] *Id*.

[23] MetLife also failed to reserve for interest, tax penalty payments, and other funds that would be due to the unpaid beneficiaries

70.     One industry analyst called this announcement a "major black eye" for MetLife, the nation's second-largest life insurer by assets.[24]

71.     Maria Vullo, Superintendent of the New York Department of Financial Services, commented on the debacle by underscoring MetLife's failure to adapt its protocols for paying claims in the modern era of worker mobility: "What used to be standard protocol for finding retirees who are owed benefits is no longer sufficient."[25]

72.     William Galvin, the Massachusetts Secretary of State, similarly launched an investigation in December 2017.  However, unlike MetLife, Massachusetts was quickly able to identify correct addresses for a majority of the unpaid Beneficiaries in Massachusetts.  As of March 1, 2018, Massachusetts had already sent letters to those members of the Class and had determined that the average age of the "missing" Beneficiaries in Massachusetts is 72.

73.     MetLife has disclosed that it has received, and is responding to, inquiries from its lead state regulator in New York and other state regulators.  The Company has also disclosed that the Securities and Exchange Commission enforcement staff  "has made an inquiry" about the matter.[26]

74.     Repercussions from MetLife's malfeasance in handling pension benefits continue to reverberate through the Company.  On May 1, 2018, MetLife announced that John Hele, its Chief Financial Officer ("CFO"), had been replaced with immediate effect.  The CFO's departure came less than a week after MetLife disclosed that it had cut Mr. Hele's pay, citing "[poor] performance

---

[24] Leslie Scism, "MetLife Says Pension Shortfall Will Prompt Financial Revisions," *The Wall Street Journal* (Jan. 29, 2018), at https://www.wsj.com/articles/metlife-says-overdue-pension-benefits-will-prompt-financial-revisions-1517262947.

[25] "NY, Mass. Investigate MetLife over Unpaid Pensions," *Chief Investment Officer* (Dec. 20, 2017), at https://www.ai-cio.com/news/ny-mass-investigate-metlife-unpaid-pensions/.

[26] https://www.wsj.com/articles/metlife-says-overdue-pension-benefits-will-prompt-financial-revisions-1517262947

in managing financial matters, including material weaknesses in internal control over financial reporting."[27]

75.    Commenting on Mr. Hele's departure, Jay Gelb of Barclays worried that the CFO's departure—just a day before the Company released its financial results for the first quarter of 2018— "raises obvious questions" about "whether MetLife's string of various charges is over, or if there are more to come."[28]

### E.    MetLife Took Mr. Roycroft's Annuity Benefits

76.    Mr. Roycroft lives in Millington, New Jersey and worked at Martindale-Hubbell from March 1970 to March 1999. As a result of his employment at Martindale-Hubbell, Mr. Roycroft was a beneficiary of a MetLife GAC.  MetLife was responsible for paying certain annuity benefits to Mr. Roycroft upon his retirement in 1999.  Mr. Roycroft was unaware that he was owed these retirement benefits.

77.    Beginning in April 1999, when Plaintiff became entitled to his annuity benefits, MetLife held, exercised dominion over, and denied Plaintiff's right to those annuity benefits, earning an unknown return thereon.

78.    In 2012, at age 70, Plaintiff called MetLife to inquire about his annuity benefits and MetLife responded by form letter.  In that correspondence, MetLife did not acknowledge that its payment of annuity benefits to Plaintiff was thirteen years late, did not provide any basis whatsoever for Plaintiff to verify the amount owed him, and did not acknowledge that Plaintiff was owed interest or other additional consideration for MetLife's decision to wrongly take

---

[27] Gray, Alistair, "MetLife Finance Chief Leaves After Reserves Debacle," *FINANCIAL TIMES* (May 1, 2018), https://www.ft.com/content/34ea5c44-4d4f-11e8-97e4-13afc22d86d4.

[28] *Id.*

possession and ownership over his funds for as long as 13 years and wrongly earn income by investing those funds.  In subsequent correspondence, MetLife was similarly non-forthcoming.

79.     Finally, on January 14, 2013, MetLife issued a check to Plaintiff in the amount of $2,508.36, as a "lump sum payment in lieu of monthly annuity." According to MetLife, this lump sum payment reflected a 20% federal income tax withholding from the "cash settlement value" of $3,135.46 calculated by MetLife with no basis provided for Mr. Roycroft to verify this calculation. MetLife knew that the annuity benefit of $3,135.46 was supposed to have been paid to Plaintiff thirteen years earlier—on or about Plaintiff's retirement date of April 1, 1999.  The check did not include any interest that had accrued during the thirteen years that MetLife had converted his annuity benefit to its own use.  Nor did it include any profits wrongfully earned by MetLife on the monies it converted to its own use but that was owed to Plaintiff.  Plaintiff deposited the check after receipt.

80.     Plaintiff is now 75 years old and has still not received all of the retirement benefits that he is due from MetLife.

81.     Thus, MetLife has clearly chosen to compensate late-paid Beneficiaries in amounts that do not reflect the present-day value of what they were owed, instead benefitting from unlawfully retaining money owed to the Plaintiff and the Class.  The payments to Mr. Roycroft and others were (among other things) late and failed to include any interest to compensate them.  MetLife has admitted that as many as 30,000 Beneficiaries still have not received any payment whatsoever.

###     F.     Additional Red Flags

82.     MetLife conducted a "complete internal audit" of the Company's annuity business in or about 1996.  This complete audit included GACs purchased by employers—including GAC 451, which should have provided annuity benefits to Mr. Roycroft.  This audit should have detected

systemic problems with the payment of annuity benefits—putting MetLife of notice that thousands of workers were in danger of not receiving the benefits they earned and that were paid for by their former employers.

83.     In addition, the estate of a former Martindale-Hubbell employee who retired in 1994 brought a FINRA arbitration proceeding against MetLife in January 2016[29] for non-payment of benefits pursuant to a GAC.[30]

84.     According to the FINRA Statement of Claims, William P. Toland, Sr. ("Mr. Toland") was the beneficiary of GAC 451 though his former employment with Martindale-Hubbell.  After working for Martindale-Hubbell for 34 years, Mr. Toland retired in February 1994.  Under the terms of GAC 451, his benefits were to commence at the latest by 1990 when Mr. Toland turned

85.     Mr. Toland was unaware that he was a beneficiary of GAC 451 and was first notified by MetLife that he was eligible for such benefits in September 2012—*18 years after his retirement.* Sadly, Mr. Toland passed away in March of 2013 and never received the annuity benefits he was due, with the claim for such benefits passing to his estate.

85.     MetLife's excuse for its failure to pay annuity benefits to Mr. Toland was that it did not have a current address at which it could contact him before 2012—despite the fact the he and his family had lived at the same home for over 48 years and he was still receiving certain other retirement benefits to which he was entitled through his employment with Martindale-Hubbell.

---

[29] FINRA Dispute Resolution No. 15-03033; *Estate of William P. Toland, Sr. vs. Metropolitan Life Insurance Company and Reed Elsevier, Inc.*
[30] On August 3, 2016, MetLife enjoined the FINRA arbitration arguing, among other things, that the dispute was not subject to mandatory arbitration pursuant to FINRA rules and that the matter should be tried in the United States District Court for the District of Massachusetts. *See Metropolitan Life Ins. Co. v. Michelle Smith, Executrix of the Estate of William P. Toland Sr.*, No. 1:16-cv-11582 (D. Mass. 2016). The Court agreed with MetLife and the matter proceeded in the District Court, eventually settling in December 2017 for an undisclosed amount.

86.     The incident with Mr. Toland alerted MetLife as of January 2016 that the Company was undergoing a systemic failure with the payment of benefits to GAC beneficiaries and underscored the human cost of this failure.  Yet, according to MetLife's December 15, 2017 disclosure that at least 30,000 beneficiaries had not received annuity benefits (discussed *supra*), the Company only "recently" initiated an "ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers."

## V.      TOLLING OF THE STATUTE OF LIMITATIONS

87.     Class members had no way of knowing that MetLife had failed to pay annuity benefits, interest, and investment proceeds on these funds until MetLife disclosed its misconduct in late 2017.

88.     Class members were not informed that they would be or were due annuity benefit payments by their employers or by MetLife.

89.     MetLife was in a position of trust with the Beneficiaries, as it held money for their benefit, was responsible for calculating the specific amount of money due to them, and was responsible for communicating with Beneficiaries about the existence of their benefits as well as the amount. These facts put MetLife into a confidential and fiduciary relationship with the Beneficiaries.

90.     Despite the nature of its relationship with the Beneficiaries and its obligations to them, MetLife failed to appropriately communicate to Beneficiaries about the existence of their annuity benefits for many years and when it did acknowledge to them that they were owed annuity benefits, MetLife did so in a way that made it appear to Beneficiaries that its conduct was lawful.

91.     MetLife failed to acknowledge that the benefits were late, that interest was due, or that it had improperly used those funds to generate investment income.  By doing so, MetLife breached

its fiduciary duties to the Beneficiaries and misled them into accepting lower payments than what they were due.

92.     Indeed, Beneficiaries only learned about the nature of MetLife's actions in its December 15, 2017 announcement. For these reasons, all applicable statutes of limitations have been equitably tolled with respect to conversion of annuity benefits and other claims alleged herein.

### VI.     CLASS ALLEGATIONS

93.     Plaintiff brings this action on behalf of himself and as a class action, pursuant to the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class").

> All Beneficiaries of Plans who were due annuity benefits, interest or investment proceeds on the unpaid annuity benefits from MetLife pursuant to Group Annuity Contracts and who did not receive the entire amount to which they were entitled.

Excluded from the class are MetLife and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family.  Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

94.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

95.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under the Rule 23 of the Federal Rules of Civil Procedure.

96.     The members of the Class are so numerous that joinder of all members is impracticable. By MetLife's own admission, those affected by the Company's misdeeds may exceed 30,000 retirees plus beneficiaries.  While the exact number of Class members is unknown to Plaintiff at this time, it can be ascertained only through appropriate discovery.

97.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- Whether Defendants held specific monies for the purpose of paying annuity benefits to Beneficiaries;

- Whether Defendants took monies reserved for paying Beneficiaries' annuity benefits for their own use and profit;

- Whether Defendants were unjustly enriched by their practice of appropriating monies reserved for annuity payments to Beneficiaries;

- The amount, if any, of statutory interest owed to Beneficiaries from Defendants' unlawful conversion of annuity monies; and

- The profit or investment returns earned by Defendants on the use of converted annuity monies.

98.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct complained of herein.

99.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation and in complex financial litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

100.    In addition, the questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

101.     This action may also be properly maintained on behalf of the Class proposed herein under Rule 23(b)(2) of the Federal Rules of Civil Procedure, insofar as the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

### VII.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Restitution**

102.     MetLife has not paid interest on annuity benefits it should have paid to Roycroft and other Annuitants where Roycroft and other Annuitants were deprived of the use of annuity monies due to MetLife's failure to timely pay them the benefits they were owed.

103.     MetLife knows that interest accrues on unpaid annuity benefits because it litigated whether such interest was subject to Abandoned Property Law. *Metropolitan Life. Ins. Co. v. Office of State Comptroller*, 120 A.D.2d 140, 508 N.Y.S. 2d 307 (Nov. 1986).

104.     To make Roycroft and others whole for MetLife's failure to timely pay them benefits, MetLife must pay Roycroft and other Annuitants interest on the benefits it failed to timely pay them. MetLife acknowledges as much were it has set aside additional reserves to cover interest on unpaid annuities.

### SECOND CLAIM FOR RELIEF
**Unjust Enrichment**

Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

105.     As the result of the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.  Specifically, Defendants have reaped substantial profits from investing benefits owed to the Plaintiff and the Class.

106.    Equity and good conscience require that Defendants make restitution by disgorging all monies, profits, and gains which they have unjustly obtained or will unjustly obtain in the future at the expense of Plaintiff and the Class and pay these funds to Plaintiff and the Class.

### THIRD CLAIM FOR RELIEF
**Accounting**

Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

107.    Defendants have wrongly taken possession of monies owed to Plaintiff and the Class.

108.    Plaintiff will likely have evidentiary support after a reasonable opportunity for further investigation or discovery to show that Defendants earned substantial profits by reinvesting the monies wrongfully taken from Plaintiff and the Class.

109.    Plaintiff and the Class will likely have no way of ascertaining the amount of profit made from these reinvestments without an accounting.

110.    Plaintiff and the Class are entitled to an accounting with respect to all funds owed or owing to the Plaintiff and the Class.

### VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, pray for relief as follows:

a.   Certifying this action as a Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.   Ordering declaratory and injunctive relief as necessary and appropriate, including enjoining Defendant from its repeated failures to pay annuity benefits to Plaintiff and the Class, an immediate accounting, and imposing a constructive trust; Ordering an

expedited Court-supervised plan to: (a) locate purportedly missing Class members; (b) provide notice to Class members; and (c) pay annuity benefits (with interest) to Class members.

c. Issuing a preliminary injunction prohibiting MetLife from settling claims for unpaid pension benefits in a manner that would require the Beneficiaries to waive any right, including but not limited to rights an accounting, interest, disgorgement of profits, or any other remedies allowed by law or equity

d. Issuing a mandatory injunction to require MetLife to pay the costs of retaining outside firms to: (a) locate Beneficiaries eligible for benefits under the GACs; (b) provide notice to Beneficiaries of the GAC benefits to which they are entitled; and (c) distribute GAC benefits owed by MetLife to eligible Beneficiaries.

e. Awarding, declaring, or otherwise providing Plaintiff and the Class all relief under applicable law that the Court deems proper and such appropriate equitable relief as the Court may order, including compensatory and punitive damages, surcharge, restitution, disgorgement of profits, equitable lien, repayment of IRS penalties or fines, or any other remedy;

f. Awarding Plaintiff's counsel attorneys' fees, reimbursement of out-of-pocket litigation expenses, expert witness fees, and other costs pursuant to the common fund doctrine and/or any other applicable doctrine;

g. Awarding pre-judgment and post-judgment interest; and

h. Awarding such other and further relief as may be just and proper.

September 21, 2018                       **BAILEY & GLASSER LLP**

                                        */s/Kevin Barrett*_____
                                        Kevin Barrett (NY Bar #2196343)
                                        137 Betsy Brown Road
                                        Port Chester, NY 10573
                                        Tel: (646) 776-8580
                                        kbarrett@baileyglasser.com

                                        Gregory Y. Porter, *pro hac vice* to be filed
                                        BAILEY & GLASSER LLP
                                        1054 31st Street, NW
                                        Suite 230
                                        Washington, DC 20007
                                        Tel: (202) 463-2101

                                        Norman Berman, *pro hac vice* to be filed
                                        Nathaniel L. Orenstein, *pro hac vice* to be filed
                                        Mark A. Delaney, *pro hac vice* to be filed
                                        BERMAN TABACCO
                                        One Liberty Square
                                        Boston, MA 02109
                                        Tel: (617) 542-8300

                                        *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 21, 2018, a true and correct copy of the foregoing

Plaintiff's Amended Class Action Complaint was filed with the Court utilizing its ECF system,

which will send notice of such filing to all counsel of record.


*/s/ Kevin Barrett*
Kevin Barrett